UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DISH NETWORK L.L.C.,

    Plaintiff,

v().  Case No:   6:12-cv-1629-Orl-41TBS

TV NET SOLUTIONS, LLC, MOHAMMAD
MUSTAFA, GLOBAL SATELLIT IP TV
SCANDINAVIAN AB and BASEM
HALABI,

    Defendants.

## ORDER

This matter comes before the Court on Plaintiff's Motion to Maintain Limited Redaction of Contract Term and Expiration Dates (Doc. 80), and Plaintiff's Motion for Extension of Time to File Redacted Documents per Court's Order (Doc. 82).   Both motions are due to be **GRANTED**.

### Background

On October 31, 2012, Plaintiff filed suit against TV Net and its co-founders, Mohammad Mustafa and Omar Raheem, asserting a common-law unfair competition claim.   (Doc. 1).   TVNet and Mustapha answered, denying liability and raising four affirmative defenses.   (Docs. 18, 27).   On December 6, 2013, Plaintiff filed a First Amended Complaint, dropping Raheem (who was deceased) and adding GTV and its president Basem Halabi as defendants.   (Doc. 49).   The First Amended complaint also added counts of direct, vicarious, and contributory copyright infringement.   (Id.).   Plaintiff served the First Amended Complaint on Halabi on December 23, 2013, and on GTV on January 16, 2014.   (Docs. 59, 60).   GTV and Halabi failed to respond and on March 14,

2014 the Clerk entered their default.  (Docs. 61-63).  Meanwhile, Plaintiff settled its claims against TVNet and Mustapha.  (Docs. 68-69).

On August 18, 2014, Plaintiff moved for default judgment and a permanent injunction against Defendants GTV and Halabi.  (Doc. 73).  Plaintiff attached a number of exhibits to the motion, including heavily redacted license agreements with foreign-language television networks.  (Docs. 73-2, 73-3).  On August 25, 2014, the Court directed Plaintiff to submit the agreements and all relevant amendments in full, either in camera or in a public filing.  On September 3, Plaintiff complied with the Court's order by submitting the agreements and all amendments and renewal letters in camera.  In the letter accompanying that submission, Plaintiff indicated that it was "in the process of negotiating renewals for certain of these television channels."

On September 9, the Court entered an order directing Plaintiff to file on the public docket a redacted copy of each agreement revealing more information than was disclosed in Plaintiff's original filing.  (Doc. 78).  The information the Court directed Plaintiff to disclose included for each agreement, the term and any renewal or amendment that operates to extend the term of the assigned license.  (Id., p. 4).  The Court added that "Plaintiff may redact parts of the terms the Court has ordered it to disclose upon showing, to the Court's satisfaction, that disclosure will cause a clearly defined and serious injury."  (Id.).  Now, Plaintiff asks the Court's "permission to redact the length of the term and the expiration date of each license agreement" from its public filing "to prevent significant competitive disadvantage and economic harm if the dates were publicized, and in order to comply with contractual confidentiality obligations." (Doc. 80, p. 2).

## Discussion

The public enjoys a qualified common-law right of access to judicial proceedings. See generally Chicago Tribune Co. v. Bridgestone/Firestone, Inc., 263 F.3d 1304 (11th Cir. 2001). The right applies to all material submitted "in connection with a substantive motion," and requires the Court to balance the interest of the parties in keeping the information confidential with the interest of the public in making it available. Id. at 1312-13. "The common law right of access may be overcome by a showing of good cause, which requires 'balancing the asserted right of access against the other party's interest in keeping the information confidential.'" Romero v. Drummond Co., 480 F.3d 1234, 1245 (11th Cir. 2007) (quoting Chicago Tribune, 263 F.3d at 1313). In balancing these interests "courts consider, among other factors, whether allowing access would impair court functions or harm legitimate privacy interests, the degree of and likelihood of injury if made public, the reliability of the information, whether there will be an opportunity to respond to the information, whether the information concerns public officials or public concerns, and the availability of a less onerous alternative to sealing the documents." Id. at 1246. Good cause is established by showing that disclosure will cause "a clearly defined and serious injury." Pansy v. Borough of Stroudsburg, 23 F.3d 772, 786 (3d Cir. 1994). See also Kamakana v. City and County of Honlulu, 447 F.3d 1172, 1181 (9th Cir. 2006) (party seeking to seal dispositive motion papers "must 'articulate[] compelling reasons supported by specific factual findings'" (quoting Foltz v. State Farm Mut. Auto. Ins. Co., 331 F.3d 1122, 1135 (9th Cir. 2003) (alterations in original))).

The term of an agreement to exclusively license (and thus assign) one of the rights enumerated in the Copyright Act determines the time period for which the licensee actually has a copyright. A licensee can obtain damages only for infringement that

occurred during the period of the exclusive license and is entitled to an injunction barring further infringement only if the exclusive license has not expired.  The dates on which the licenses expire may therefore be dispositive as to copyright infringement remedies, and "[d]ocuments that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality."  In re Specht, 622 F.3d 697, 701 (7th Cir. 2010).  The nature of the right Plaintiff asserts—a right to exclude anyone from making certain uses of the works at issue—and the nature of the relief it seeks—an injunction—further heighten the public's interest in disclosure of the relevant terms of the agreement.

But the public right to access is not absolute, even as to filings that bear directly on the merits of the case.  When the interest in secrecy is sufficiently compelling, the Court may redact portions of a trial transcript, maintain trial exhibits under seal, or even limit public access to a trial itself.  See, e.g., Jazz Photo Corp. v. United States, 439 F.3d 1344, 1358 (Fed Cir. 2006) (holding that the Court of International Trade did not abuse its discretion in denying patentee the ability to attend trial and sealing the trial record in case brought by adjudicated infringer against the U.S. Customs Bureau challenging the exclusion of allegedly infringing articles).  In commercial disputes, "the usual justification" for such keeping information confidential "is the presence of trade secret," although redaction may be justified by other reasons, such as a significant risk of competitive injury from disclosure of confidential agreements.  SmithKline Beecham Corp. v. Pentech Pharmaceuticals, Inc., 261 F. Supp. 2d 1002, 1008 (N.D. Ill. 2003) (Posner, J.) (allowing redaction from settlement agreement of information "that might give other firms an unearned competitive advantage").  Conclusory allegations of competitive harm from disclosure are not enough, especially when the redacted information is central to the

resolution of the case.   See Pansy, 23 F.3d at 786 ("Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not support a good cause showing.")

Plaintiff identifies several ways in which disclosure of the dates on which its licenses expire could cause it serious competitive injury.   First, Plaintiff fears that its competitors in the United States market for subscription television service "would be able to implement programming acquisition strategies to target DISH when it is vulnerable to pressure in re-licensing negotiations."   (Doc. 80, p. 4; Doc. 80-1, ¶ 10).   Plaintiff argues that disclosure of this information would compromise the secrecy of its "strategies for timing renewal and timing acquisition of new licenses," strategies it regards as trade secrets.   (Doc. 80, p. 5).   Plaintiff also asserts that the market for United States distribution rights of foreign-language television programming is highly competitive because the corresponding market of consumers interested in such programming constitutes a very small segment of the market for subscription television service generally.   (Doc. 80, p. 5; Doc. 80-1, ¶ 5).   Plaintiff notes that, on one occasion, a competitor who obtained this information was able to persuade a Russian-language broadcaster not to renew its license with Plaintiff but to exclusively license its content to the competitor.   (Doc. 80, pp. 5-6; Doc. 81, ¶ 11).   Plaintiff lost 15% of its Russian language package subscribers in the following month, and another 15% over the next year.   (Doc. 80, p. 6; Doc. 80-1, ¶ 11-12).   Plaintiff also alleges that Arabic-language television providers generally license channels on an exclusive basis, so that if Plaintiff loses the right to carry these channels exclusively it will probably not be able to carry them at all.   (Doc. 80, p. 6; Doc. 80-1, ¶ 13).

Plaintiff maintains that disclosure would be harmful even if it did not lose any channels or subscribers. (Doc. 80, p. 7). Plaintiff argues that if its competitors are able to learn the expiration date of its licenses, they will be able to exert "unfair competitive pressure" by "being able to time their bids against DISH as if the programming was a public auction." (Id.). Even if Plaintiff is ultimately able to renew the licenses, the presence of additional bidders could increase the price Plaintiff must pay. (Id.). Moreover, the Arabic-language content providers may point to license agreements for other channels in demanding shorter terms for their agreements. (Id.; Doc. 80-1, ¶ 14). Finally, Plaintiff worries that disclosing the expiration dates to Defendants GTV and Halabi could cause it injury should GTV choose to enter the market for licenses to broadcast foreign-language television programming in the United States. (Doc. 80, p. 8). Plaintiff fears that GTV may use the "ill gotten gains" from its "theft of linear television channels" to bid against it for licensing rights. (Doc. 80, p. 8).

Separately, Plaintiff argues that the Arabic-language broadcasters, who are not parties to this litigation, could be harmed by disclosure. (Doc. 80, p. 8-9). Plaintiff speculates that "competitor channels could approach" Plaintiff and "attempt to persuade [Plaintiff]" to stop carrying the channels it is currently carrying. (Doc. 80, p. 8). Plaintiff also suggests that revealing the terms of these licenses might harm the broadcasters in attempting to negotiate agreements with distributors for exclusive licenses in other countries. (Doc 80, pp. 8-9; Doc. 80-1, ¶ 9; Doc. 80-2).

The Court is persuaded that a competitor, armed with knowledge of the expiration dates of Plaintiff's license agreements, would be better equipped to persuade the licensors to license their channels to it rather than Plaintiff. If Plaintiff loses the right to carry some or all of these channels to its competitors, Plaintiff's subscribers will be

unhappy and some may cancel their subscriptions and subscribe to a competitor's platform. Even if Plaintiff is able to keep the channels, it may have to pay more than it otherwise would have. Plaintiff will not enjoy a similar advantage in pursuing exclusive licenses for channels carried by its competitors. Accordingly, the Court finds that the risk of subscriber loss or increased license fees likely to result from a carefully-timed campaign by a competitor to outbid Plaintiff for a channel is clearly defined and serious enough to warrant keeping the expiration dates of Plaintiff's license agreements confidential despite their importance to the merits of the case. Therefore, the Court will permit Plaintiff to redact information that would reveal to a competitor when its licenses will expire.

While the Court is not requiring Plaintiff to publicly disclose the expiration dates of its licenses, it cannot promise Plaintiff that it will never have to disclose that information to Defendants. The right to due process includes the right to "'be aware of and refute'" evidence presented by the opposing party. Vining v. Runyon, 99 F.3d 1056, 1057 (11th Cir. 1996) (quoting Application of Eisenberg, 654 F.2d 1107, 1112 (5th Cir. Unit B 1981)). In Vining, the Eleventh Circuit held that "consideration of *in camera* submissions to determine the merits of litigation is allowable only when the submissions involve compelling national security concerns or the statute granting the cause of action specifically provides or *in camera* resolution of the dispute." Id. (citing Abourezk v. Reagan, 785 F.2d 1043, 1061 (D.C. Cir. 1986)). A party's right to access evidence, of course, is conditioned on the party's participation in the litigation, see FED. R. CIV. P. 55(b)(2) (requiring that a party who has "appeared" in a case must be notified prior to hearing on motion for default judgment); 10A Wright & Miller, Federal Practice & Procedure § 2687 n. 6 (3d ed.) (collecting cases holding, by negative implication from

Rule 55(b)(2), that a party who has failed to appear and is in default need not be notified of ongoing proceedings), and Defendants GTV and Halabi have chosen not to participate in this case. District courts routinely consider *in camera* submissions in determining remedies issues following default judgments. See, e.g., Hosking v. New World Mortgage, Inc., 570 Fed. Appx. 28, 31 (2d Cir. 2014) (noting that district court permitted plaintiffs to provide records for in camera review in support of claimed damages and attorney's fees); National Fitness Co. v. ProCore Laboratories, LLC, No. 3:11-CV-1352-L, 2013 WL 4546860, at *3 (N.D. Tex. Aug. 28, 2013) (noting that plaintiffs in default judgment cases may submit attorney billing records *ex parte* if they are concerned about "divulging privileged or confidential matters"); Corsage Collection, Inc. v. GN Diamond, LLC, Civ. No. 06-382, 2011 WL 1532369, at *2 n. 5 (E.D. Pa. Mar. 23, 2011) (citing documents submitted by plaintiff *in camera* on issue of damages); Days Inn Worldwide v. Apurva, L.C., Civ. No. 08-1441, 2009 WL 2568099, at *5 (D.N.J. Aug. 18, 2009) (inviting *in camera* submission of attorney time records); Sierra Petroleum Co., Inc. v. YSM, Inc., Civ. No. 07-1526 (PJS/RLE), 2008 WL 189957, at *6 (D. Minn. Jan. 2, 2008) (same); Town & Country Kids, Inc. v. Protected Venture Investment Trust #1, Inc., 178 F.R.D. 453, 454 (E.D. Va. 1998) (ex parte hearing held on issue of damages). But see Hillberry v. The Wooden Teddy Bear, Inc., No. 07-cv-00913-WDM-KMT, 2009 WL 189945, at *1 (D. Colo. Jan. 26, 2009) (refusing to allow defendant, who moved for default judgment on cross-claim against co-defendant, to submit settlement agreement with plaintiff *in camera* or under seal as evidence of damages). So, for now, Plaintiff's *in camera* submission of the unredacted license agreements and amendments and public filing of redacted agreements will be sufficient.

### Conclusion

Because Plaintiff has shown that it may suffer a clearly defined and serious injury if the expiration dates of its licenses are disclosed to public, the Court will GRANT Plaintiff's motion (Doc. 80).   Plaintiff may redact from its public filing, expiration dates and other terms that would allow a competitor to discern when Plaintiff's licenses expire.   Plaintiff shall file redacted copies of the agreements on the public docket in accordance with the Court's September 9, 2014 order, as modified by this order by October 16, 2014.

**DONE** and **ORDERED** in Orlando, Florida on October 2, 2014.

THOMAS B. SMITH
United States Magistrate Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties