UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DISH NETWORK L.L.C.,

     Plaintiff,

v.                               Case No:   6:12-cv-1629-Orl-41TBS

TV NET SOLUTIONS, LLC, MOHAMMAD
MUSTAFA, GLOBAL SATELLIT IP TV
SCANDINAVIAN AB and BASEM
HALABI,

     Defendants.

_____

### REPORT AND RECOMMENDATION

Pending before the Court are Plaintiff's Motion for Default Judgment and for a Permanent Injunction (Doc. 73) and Motion for Default Judgment Damages (Doc. 79) against Defendants Global Satellite IP TV Scandinavian AB ("GTV") and Basem Halabi. After due consideration I respectfully recommend that both motions be GRANTED.

## I. Background

Plaintiff Dish Network, L.L.C., is a large provider of satellite television that competes with other telecommunications companies to provide subscription-based television service to American households and business.   (Doc. 49, ¶ 3).   To gain a competitive advantage in the small but growing niche market of Arabic-speaking customers in the United States, Plaintiff negotiated contracts with broadcasters of 23 Arabic language television channels[1] to become the exclusive US-based provider of those channels.   (Id., ¶¶ 11, 30-31).   The contracts granted Plaintiff the exclusive right to

---

[1] Abu Dhabi TV, Aghapy TV, Al Arabiya, Al Hayat 1, Al Hayat Cinema, Al Jazeera, Al Kahera Wal Nas, Al Yawm, Dream2, Dubai Sports, Dubai TV, ESC, Future TV, IQRAA, MBC, MBC Drama, MBC Kids, MBC Masr, Murr TV, New TV, Nile Drama, Noursat, and OTV.   (Doc. 49, ¶ 11).

distribute and publicly perform the channels within the United States by traditional means (cable and satellite) as well as by Internet Protocol TV (IPTV)[2]; some also grant Plaintiff the exclusive right to display, distribute, and publicly perform certain channels via the Internet.[3]   (Id.).

Sometime during or prior to 2012, a new competitor, Defendant TV Net Solutions, LLC ("TV Net") entered the market for providing Arabic-language television.   In its advertising to consumers, TV Net claimed to provide "220 TV channels from the Arab world," (Doc. 1, ¶ 16), including some that had been exclusively licensed to Plaintiff.   TV Net marketed itself as a lower-cost alternative to Plaintiff, encouraging consumers not to "pay dish network a crazy amount of money for 30 channels."   (Id., ¶ 20).

On October 31, 2012, Plaintiff sued TV Net and its co-founders, Mohammad Mustafa and Omar Raheem, alleging common-law unfair competition.   (Doc. 1).   TV Net and Mustapha answered, denied liability, and asserted four affirmative defenses.   (Docs. 18, 27).   On December 6, 2013, Plaintiff filed its First Amended Complaint, dropping Raheem (who was deceased) and adding GTV and its president Halabi as defendants. (Doc. 49).   The First Amended Complaint also added counts of direct, vicarious, and contributory copyright infringement.   (Id.).

Plaintiff alleges that TV Net provides Arabic language television programming through an IPTV platform and an internet-based platform called "WebTV" to consumers in

---

[2] IPTV is a system by which television providers deliver television services to consumers using the Internet, rather than traditional platforms such as cable or satellite.   IPTV, http://en.wikipedia.org/w/index.php?title=IPTV&oldid=629016703 (last visited Oct. 10, 2014, as were all of the other pages cited in this Report and Recommendation).   An example of an IPTV system is AT&T's U-verse.   See AT&T, What is IPTV, https://www.att.com/Common/about_us/files/pdf/IPTV_background.pdf.
[3] Internet television is simply television broadcasted over the Internet.   Internet television, http://en.wikipedia.org/w/index.php?title=Internet_television&oldid=626609901.   Popular providers of Internet television include Netflix and Hulu.   Some cable channels, most notably ESPN (WatchESPN) and HBO (HBO GO), offer Internet television service to households that receive those channels as part of their cable or satellite TV subscriptions.

the United States for a subscription fee.   (Doc. 49 ¶¶ 15-18).   The programming TV Net
provides includes 23 channels which Plaintiff also provides to its customers.   (Id.)   To
deliver these channels to its customers, GTV captures satellite broadcasts of them, which
it retransmits to servers maintained by GTV and TV Net.   (Id. ¶ 21).   From these
servers, the channels are transmitted to customers who request them.   (Id.).

Plaintiff claims that by virtue of its exclusive license agreements with the foreign-
language networks, it owns copyrights to programming broadcast on the licensed
channels.   (Id. ¶¶ 30, 31).   Plaintiff alleges that Defendants infringe its copyrights in that
programming by providing the same content to U.S. consumers.   (Id. ¶ 33, 34).   Plaintiff
also alleges that Defendants' conduct violates its exclusive rights to distribute and to
publicly perform the copyrighted content within the United States.   (Id. ¶ 33); see also 17
U.S.C. § 106(3), (4).

The First Amended Complaint was served on Halabi on December 23, 2013, and
on GTV on January 16, 2014.   (Docs. 59, 60).   These Defendants failed to respond and
on March 14, 2014, on Plaintiff's motion, the Clerk entered their default.   (Docs. 61-63).

Settlement negotiations between Plaintiff, TV Net and Mustafa proved fruitful, and
on May 29, 2014, these parties submitted a Stipulation for Entry of Agreed Permanent
Injunction and Order of Partial Dismissal.   (Doc. 68).   On June 4, the Court entered the
requested injunction, which bars TV Net and Mustafa from providing any content that airs
on 24 specifically named channels "and any other channel or content to which [Plaintiff]
holds exclusive distribution or performance rights," providing any equipment or service
that enables access to those channels, and providing any television equipment or service
supplied by GTV, Halabi, or non-party Advanced TV Network Sweden AB, that is used to
access infringing content.   (Doc. 69).

On August 18, 2014, Plaintiff moved for default judgment and a permanent injunction against GTV and Halabi.   (Doc. 73).   Plaintiff seeks an injunction barring GTV and Halabi from distributing or publicly performing the IQRAA, New TV, and Noursat channels by IPTV, and the Aghapy TV, Al Arabiya, Al Yawm, Dream 2, ESC, Future TV, MBC, MBC Drama, MBC Kids, MBC Masr, and Nile Drama channels by IPTV or Internet. (Id. at 22).   Plaintiff also asks the Court to enjoin GTV and Halabi from "distributing or publicly performing any other television channel in any manner that violates [Plaintiff's] exclusive distribution or public performance rights."   (Id.).   Plaintiff attached the following exhibits to its motion:

- Declaration of Christopher Kuelling, Plaintiff's Senior Vice President of International Business & Legal Affairs (Doc. 73-1).   Exhibits 1-12 to the Kuelling declaration are heavily redacted versions of Plaintiff's agreements with the Arabic-language networks.   (Docs. 73-2 to 73-3).

- Declaration of Ricardo Pizzatto, an Account Director with NetResult Solutions, which Plaintiff hired to monitor Defendants' services and deliver an analysis of the services and content Defendants provide.   (Doc. 73-4).   The results of the analysis are attached as an exhibit to the declaration.   (Doc. 73-5).

- Declaration of Mahmoud ElDanaf, a Distribution Manager at MBC FZ LLC, a United Arab Emirates-based television network that broadcasts MBC, MBC Drama, MBC Kids, MBC Masr, and Al Arabiya (collectively, the "MBC channels").   (Doc. 73-6).

- Declaration of Timothy M. Frank, Plaintiff's attorney, along with sixteen exhibits. (Docs. 73-7, 73-8, 73-9).

On August 25, the Court directed Plaintiff to submit unredacted versions of the contracts with the Arabic-language networks, either *in camera* or on the public docket. (Doc. 75).   Plaintiff chose to submit the documents *in camera* "[d]ue to the confidential nature of the agreements."   (Doc. 77).   The Court received Plaintiff's *in camera* submission on September 3.   (Docs. 76, 77).   On September 9, the Court entered an order directing Plaintiff to submit copies of the agreements with less extensive redactions. (Doc. 78).   The Court also noted that several of the agreements had expired, and gave Plaintiff the opportunity to submit any renewals, amendments, or new agreements it had negotiated.   (Id.).   On September 29, Plaintiff requested permission to redact information relating to the term and expiration date of its licenses from it public filing. (Doc. 80).   The Court granted Plaintiff's motion on October 2, and later that day, Plaintiff filed redacted copies of the agreements in accordance with the Court's order.   (Docs. 83, 84).   Plaintiff also submitted, *in camera*, copies of agreements that operate to renew the licenses that had expired.   (Doc. 81).

## II. Discussion

### A. Threshold Issues

As an initial matter, the defaults against GTV and Halabi were properly entered. The federal rules require court clerks to enter a defendant's default "[w]hen service of process is properly effected, but the served party fails to respond in a timely manner…." Kelly v. Florida, 233 Fed. Appx. 883, 885 (11th Cir. 2007) (citing FED. R. CIV. P. 55(a)).   A foreign individual or corporation may be served abroad "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents." FED. R. CIV. P. 4(f)(1), (h)(2).   Plaintiff has attached certificates of service issued by the

County Administrative Board of Stockholm confirming that GTV and Halabi were served in accordance with Swedish law.   (Docs. 59, 60); see Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, art. 5.   Because these Defendants were properly served and failed to respond, the Clerk properly entered their defaults.   (Doc. 61).

This Court may exercise jurisdiction over GTV and Halabi.   Federal Rule of Civil Procedure 4(k)(1)(A) states that a defendants is subject to personal jurisdiction in this Court if the defendant would be subject to jurisdiction in the state court (in this case, Florida).   A Florida state court may exercise jurisdiction over a defendant if (1) the Florida long-arm statute, FLA. STAT. § 48.193, authorizes the exercise of personal jurisdiction and (2) exercising personal jurisdiction over the defendant does not violate due process.   Mutual Service Ins. Co. v. Frit Industries, Inc., 358 F.3d 1312, 1319 (11th Cir. 2004).   The Florida long-arm statute provides jurisdiction over a defendant who "commit[s] a tortious act within this state."   FLA. STAT. § 48.193(1)(a).   By transmitting programming on the licensed channels to viewers in Florida, GTV and Halabi have committed a tortious act in this state and thus, their conduct brings them within the reach of Florida's long-arm statute.   The same tortious conduct also creates the necessary "minimum contacts" with the state of Florida, such that exercising personal jurisdiction over these Defendants is consistent with "traditional notions of fair play and substantial justice."   International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).   Because GTV and Halabi "expressly aimed" their "intentional, and allegedly tortious" conduct at Florida, they "must 'reasonably anticipate being haled into court [h]ere' to answer for" their alleged infringement.   Calder v. Jones, 465 U.S. 783, 789-790 (1984) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).

Plaintiff has complied with the Servicemembers Civil Relief Act, 50 U.S.C. appx. § 521(b)(1) by attaching to the Frank declaration, a certification from the Department of Defense Manpower Data Center that Halabi has not been on active duty status in the United States Military.   (Doc. 73-8 at 20-22).

B. Basis for Entry of Default Judgment against Defendants

The entry of default by the Clerk does not require the court to enter a default judgment.   DIRECTV, Inc. v. Trawick, 359 F. Supp. 2d 1204, 1206 (M.D. Ala. 2005). Before judgment can be entered pursuant to Rule 55(b), there must be a sufficient basis in the pleadings to support the relief sought.   Id.   "The defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law.   In short ... a default is not treated as an absolute confession of the defendant of his liability and of the plaintiff's right to recover."   Nishimatsu Construction Co. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975).[4]

1. Determining the governing legal rules and principles

This case involves the public performance in the United States by Swedish defendants of works created in several Arabic-speaking countries in violation of exclusive rights asserted by an American plaintiff.   Resolving the legal issues presented requires the Court to make a conflict of laws analysis.   Because this case arises under federal law, federal law supplies the choice of law rules.   Where Congress has specified an applicable choice of law rule or manifested its intention that a provision of the Copyright Act control regardless of the presence of foreign elements in the case, courts must give effect to Congress' wishes.   See Restatement (Second) of Conflict of Laws § 6(1).

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

Absent a statutory directive, the Court will apply the choice of law principles identified in the Restatement (Second) of Conflict of Laws.   Chau Kieu Nguyen v. JP Morgan Chase Bank, NA, 709 F.3d 1342, 1345 (11th Cir. 2013).   Pursuant to § 6 of the Restatement, the Court considers which state has the most significant relationship to the particular issue, based on consideration of all of the relevant factors, including "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability, and uniformity of result, and (g) ease in determination and application of the law to be applied."   Under the doctrine of dépeçage, which is recognized by the Restatement, see Restatement (Second) of Conflict of Laws § 145, cmt. d, courts resolve conflicts of laws on an issue-by-issue, rather than a case-by-case basis.   See Estate of Miller ex rel. Miller v. Thrifty Rent-A-Car System, Inc., 609 F. Supp. 2d 1235, 1251 (M.D. Fla. 2009).

Since the infringement occurred in the United States, the Copyright Act defines the elements of Plaintiff's cause of action, the scope of copyright protection, and Defendants' liability for infringement.   Itar-Tass Russian News Agency v. Russian Kurier, Inc., 153 F.3d 82, 91 (2d Cir. 1998); Edmark Industries SDN. BHD. v. South Asia Int'l (H.K.) Ltd., 89 F. Supp. 2d 840, 843-44 (E.D. Tex. 2000); see also Microsoft Corp. v. AT&T Corp., 550 U.S. 437, 454-55 (noting the "presumption that United States law governs domestically but does not rule the world").   To prevail on a copyright infringement claim, a plaintiff must show (1) that it owns a valid copyright in a work and (2) that the defendant violated one of its exclusive rights in the work.   17 U.S.C. § 501(a).   The Copyright Act

grants authors the exclusive rights to: copying, preparation of derivative works, distribution, public performance, and public display.   17 U.S.C. § 106.

Which country's (or countries') law governs issues of copyright ownership is more complicated.[5]   Eleventh Circuit case law provides that the initial ownership of copyright is governed by the law of the country where the work originated.   See Saregama India, Ltd. v. Mosley, 635 F.3d 1284, 1290 (11th Cir. 2011).   In most countries, including the United Arab Emirates and the United States, "copyright" ownership vests initially in the "author" of the work.   Federal Law No. 7 of the Year 2002 Concerning Copyright and Neighboring Rights, art. 2, available at http://www.wipo.int/edocs/lexdocs/laws/en/ae/ae001en.pdf (English translation); 17 U.S.C. § 201(a).   Similarly, international copyright treaties, including the Berne Convention, refer to the rights of "authors."   See, e.g., Berne Convention for the Protection of Literary and Artistic Works, arts. 3(1), 4.   However, the Berne Convention does not define "author," and rules for who qualifies as one vary between countries.   See, e.g., Itar-Tass, 153 F.3d at 92 (noting that Russian law excludes newspapers from authorship under the work-for-hire doctrine).

Applying the law of the country where a work is created will, in most cases, best protect the justified expectations of parties who contract around the creation of works,

---

[5] "Ownership of copyright" in this context simply means someone entitled to bring suit under § 501(b) of the Copyright Act–"[t]he legal or beneficial owner of an exclusive right" enumerated in § 106. 17 U.S.C. § 501(b).   This is important because some foreign legal systems define "ownership" more narrowly but nevertheless extend standing to sue for infringement to exclusive licensees.   See David Nimmer, Corcovado: Renewal's Second Coming or False Messiah, 1 UCLA Ent. L. Rev. 127, 135 (1994). It also raises the possibility that rights distinguished from "copyright" under foreign legal systems (often referred to as "neighboring rights") may nevertheless constitute a "copyright" under the Copyright Act.   For example, the law of the United Arab Emirates affords "broadcasting organizations" the rights "to grant licenses for exploitation of their recordings and broadcasting programmes," and "to prohibit any communication of their programmes or recordings to the public without their authorization."   Federal Law No. 7 of the Year 2002 Concerning Copyright and Neighboring Rights, art. 3(19), available at http://www.wipo.int/edocs/lexdocs/laws/en/ae/ae001en.pdf (English translation).   A person who enjoys the right to "exploit" and to "prohibit any public communication" of a work, pursuant to the laws of the state where the work was created, is arguably the "owner" of a "copyright" within the meaning of the Copyright Act.

because the parties will typically rely on the default rules of that country.   Cf. Community for Creative Non-Violence v. Reid, 490 U.S. 730, 749-50 (1989) (emphasizing the importance of "predictability and certainty in copyright ownership" in giving the term "employee" as used in the Copyright Act's work-for-hire provision its common-law meaning).   While the policies underlying the rules for determining authorship of the state of origin and the state of exploitation may conflict, the state of origin will ordinarily have a stronger interest because it is regulating activity occurring within its territory. Additionally, defining for any particular work, a single author or group of authors with whom everyone in the world can negotiate for rights to exploit and disseminate the work facilitates international commerce, and encourages the creation and spread of information which is an important goal of copyright law.   See U.S. Const., Art. I, § 8, cl. 8.

What law governs the effectiveness and scope of an assignment of a copyright is a closer question.   See Saregama India, 635 F.3d at 1291-92 ("[T]here is no guiding case law regarding which country's law governs the issue of copyright transfer.").   The Copyright Act itself resolves one of the potential conflicts.   Section 204(a) provides that any "transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."   17 U.S.C. § 204(a).   Subsection (b)–which provides that a properly-issued certificate of acknowledgement is "prima facie evidence of the execution of the transfer" of ownership, whether issued within the United States or in a foreign country–makes clear that Congress intended the requirements of subsection (a) to apply to all assignments of United States copyrights, wherever executed.   7 William F. Patry, Patry on Copyright § 25:56.

Congress did not specify which country's law a court should apply to answer other questions regarding the effectiveness of a transfer of a copyright in a work created abroad.   At least between the laws of the United States and the United Arab Emirates, there does not appear to be a conflict.   Both the United States and United Arab Emirates recognize free alienability and the divisibility of copyright.   17 U.S.C. § 201(d)(2) ("Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred ... and owned separately."); Federal Law No. 7 of the Year 2002 Concerning Copyright and Neighboring Rights, art. 9 ("The author or his successors, can transfer to a ... third party, all or part of his economic rights stipulated in this law...." (emphasis added)).[6]   Nor is there anything in United States or, as far as I am aware, United Arab Emirates copyright law that prevents the parties from transferring copyrights to works the parties anticipate one of them will create in the future.

Not all of Plaintiff's agreements implicate only United States and UAE law.   Three of the foreign language networks–Dream 2, ESC, and Nile Drama–are based in Egypt, and Future TV is based in Lebanon.[7]   The agreements do not clearly identify the home countries of Aghapy TV, IQRAA, New TV, and Noursat.   It is possible that some of the programming on these channels may have been created somewhere other than the respective network's home country, and that the law of one or more of these countries regarding transfer of copyright conflicts with United States law.

_____

[6] Lebanese and Egyptian copyright law also recognize divisibility of copyright.   See Law No. 75 on the Protection of Literary and Artistic Property, art. 16, available at http://www.wipo.int/wipolex/en/text.jsp?file_id=128484 (Lebanon) (English translation); Law No. 82 of 2002 on the Protection of Intellectual Property Rights, art. 149, available at http://www.wipo.int/wipolex/en/text.jsp?file_id=190001 (Egypt) (English translation).

[7] See Dream 2 Agreement dated March 24, 2008, p. 1; Dream 2 Agreement dated September 2, 2014, p. 1; ESC/Nile Drama Agreement, p. 1; Future TV Agreement, p. 1.

There is at least arguably a conflict between Egyptian law and United States law regarding the effectiveness of transfers of copyrights in future works.   Egyptian law provides that "[a]ny disposal by the author of his future intellectual production shall be considered as null and void."   Law No. 82 of 2002 on the Protection of Intellectual Property Rights, art. 153, available at http://www.wipo.int/wipolex/en/text.jsp?file_id=190001 (English translation).   It is plausible to construe the Egyptian law to prohibit only the disposal of an author's entire "future intellectual production," or alternatively to prohibit any disposal of an author's "future intellectual production."   So there may or may not be a conflict.   But, the Court is not an expert on Egyptian law and is in a poor position to choose between plausible interpretations of a statute that has been translated from Arabic to English.

I conclude, however, that it does not matter whether Egyptian law–or any other relevant country's law pertaining to transfer of copyrights–does or does not allow a transfer of copyrights as envisioned in the license agreements.   Assuming a conflict exists, United States law should control questions of the effectiveness and validity of the transfers.   This is so because the United States has the most significant relationship to the issue of whether these agreements, each of which purports to grant "the exclusive license and right" to publicly perform television programming within the United States, along with "all intellectual property rights appurtenant thereto,"[8] validly transfer a "copyright."

---

[8] MBC Agreement, ¶ 2.1; Al Arabiya Agreement, ¶ 2.1; MBC Kids/Drama Agreement, ¶ 2.1; MBC Masr Agreement, ¶ 2.1; Aghapy TV Agreement, ¶ 2.1; Al Yawm Agreement, ¶ 2.1; Dream 2 Agreement dated March 24, 2008, ¶ 2.1; Dream 2 Agreement dated September 2, 2014, ¶ 3(a); ESC/Nile Drama Agreement, ¶ 2.1; Future TV Agreement, ¶ 2.1; IQRAA Agreement, ¶ 2.1; New TV Agreement, ¶ 2.1; Noursat Agreement, ¶ 2.1.

The validity of the transfers can be characterized as an issue of contract law or copyright law.   See William Patry, Choice of Law and International Copyright, 48 Am. J. Comp. L. 383, 432 (2000).   If a court characterizes an issue as one of contract law, and the parties have specified in the contract that a particular state's law applies to the contract, then the court will defer to the parties choice unless there is no reasonable basis for the choice, or application of the chosen state's law would be "contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue," and which also has the most significant relationship to the transaction and the parties.   Restatement (Second) of Conflict of Laws §§ 187(2), 188.   The ESC/Nile Drama agreement selects French law as controlling.[9] ESC/Nile Drama Agreement, ¶ 13.7.   All the other contracts include a New York, Washington, or Colorado choice of the law.[10]   Given that the agreements are effective to transfer copyright under United States law, and that the agreements transfer to a United States company exclusive rights to publicly perform works in the United States, I find that the United States has a significant relationship to the contracts and the parties with respect to the issue of transferability.   Although the country of origin might also have an

---

[9] French law would permit the assignment of copyright in the ESC/Nile Drama Agreement.   French law bars only the "[t]otal transfer of future works," Intellectual Property Code, art. L131-1, available at http://www.legifrance.gouv.fr/content/download/1959/13723/version/3/file/Code_35.pdf, and the ESC/Nile Drama agreement assigns only the right to publicly perform the works in question in the United States. ESC/Nile Drama Agreement, pp. 1, 6.   Moreover, French law also recognizes divisibility of copyright and regards partial transfers as effective.   Intellectual Property Code, art. L131-4.   Finally, French law requires that any assignment of the "right to exploit a work in a form that is unforeseeable and not foreseen on the date of the contract shall be explicit and shall stipulate participation correlated to the profits from exploitation."   Id. art. 131-6.   The ESC/Nile Drama agreement includes such an explicit assignment, and the price provisions of the contract would ensure that, should Plaintiff launch the ESC/Nile Drama channel on such a platform, the network would benefit from the additional subscribers.   ESC/Nile Drama Agreement, pp. 6, 11-12.

[10] See MBC Agreement, ¶ 13.7; Al Arabiya Agreement, ¶ 13.7; MBC Kids/Drama Agreement, ¶ 13.6; MBC Masr Agreement, ¶ 14.5; Aghapy TV Agreement, ¶ 13.6; Al Yawm Agreement, ¶¶ 13.6.2, 13.7; Dream 2 Agreement dated March 24, 2008, ¶ 13.6; Dream 2 Agreement dated September 2, 2014, ¶ 17(c)(i); Future TV Agreement, ¶ 13.5; IQRAA Agreement, ¶ 13.7; New TV Agreement, ¶ 13.7; Noursat Agreement, ¶ 13.7.

interest in enforcement of more restrictive laws that limit an authors' ability to transfer copyrights in their works, it is difficult to fathom how such an interest could be "materially greater" that the United States' interest in applying its laws providing for the free alienability of copyright where, as here, the copyright holders transferred only the right to distribute and publicly perform works within the United States.[11]

Laws restricting alienation of copyright are typically premised on the notion that "literary and artistic works [are] inalienable extensions of the author's personality" and that one of the functions of copyright is to protect the author's dignitary interests in his or her works.   Neil Netanel, Copyright Alienability Restriction and the Enhancement of Author Autonomy: A Normative Evaluation, 24 Rutgers L.J. 347, 350 (1993).   Because the authors in this case are businesses, policies aimed at furthering individual dignity and other personal rights are of less concern than if the Court was dealing with human authors.   And, policies like those embodied in the Copyright Act that favor alienability of copyright make it easier for foreign authors, whether human or non-human, to exploit their works in this country.   Since the country of origin cannot have a "materially greater" interest in application of its laws restricting alienability than the United States has in its laws promoting alienability, the parties' choice of United States law should control.

If a court characterizes an issue as one of property law, then the court will apply the law[12] of the state which has the most significant relationship to the thing and the

---

[11] If the agreements purported to transfer copyright globally, the relative interests of the country of exploitation and the country of origin might be different.

[12] In some circumstances, the Restatement provides that the forum should apply the choice of law rules–rather than simply the substantive law–of the state with the most significant relationship to the property in question.   Id. § 222.   This procedure is called "renvoi."   See id. § 9.   Courts apply renvoi in cases where it is especially important that different forums achieve the same result in deciding an issue. Id.   Because I conclude that the United States has the most significant relationship with the issues surrounding transfer of copyright, I need not consider whether renvoi would be appropriate in this case.

parties.   Restatement (Second) of Conflict of Laws § 222.   Upholding the validity of the copyright transfers in this case furthers United States policies favoring free alienation of copyright as a means of encouraging the creation and dissemination of works, while doing little violence to policies of foreign countries that relate to protecting the dignity and personal interests of authors.   Allowing the transfers will promote basic policies underlying copyright law by making it easier for foreign authors to exploit their works in the United States.   Applying United States law also protects the parties' expectations that Plaintiff will be able to disseminate these channels to customers in the United States without having to worry about a competitor distributing the same content.   This inures to the benefit of both Plaintiff and the networks, and gives Plaintiff the ability to sue anyone who tries to broadcast the content to the public without authorization.   Upsetting the parties' reasonable expectations that their agreements will be enforced, and that Plaintiff will be able to enforce the copyrights, would harm the needs of the international system. Montgomery v. Wyeth, 540 F. Supp. 2d 933, 945 (E.D. Tenn. 2008).   Because copyright infringement actions are typically brought in the place of infringement, applying the law of the place of infringement to issues of transferability means that the forum will be applying its own law.   Finally, there is no reason to believe that applying United States law to find the transfers valid would lead to the sort of forum-shopping that would so undermine "certainty, predictability, and uniformity of result" as to outweigh the other six factors.

2. *Application of law to facts*

Plaintiff has established that it owns a valid copyright in these television programs, as well as any other programs broadcast on the licensed channels in which the foreign-language networks own copyrights.   First, it has alleged, and GTV and Halabi are deemed to have admitted, that Plaintiff has the "exclusive right to distribute and publicly

perform in the United States," by certain transmission methods, "all programming" on the channels in question.   (Doc. 49, ¶¶ 30-31).

Second, Plaintiff has submitted evidence of specific works Defendants have infringed.   In his declaration, Mahmoud ElDanaf, a Distribution Manager at MBC FZ LLC ("MBC"), a company that broadcasts several of the channels at issue, states that he was provided video recordings of MBC programs from Defendants' services between February 13 and February 19, 2014.   (Doc. 73-6, ¶ 11).   He states that the recordings included episodes of four series authored by MBC in the United Arab Emirates and shown on MBC, MBC Kids, MBC MASR, and Al Arabiya.   (Id., ¶¶ 11-12).[13]   Under UAE law, these television programs constitute "collective works," as they were "compiled by a group of authors under the direction of a natural or legal person who pledges to publish it in his name and under his own supervision," and because the individual contributions are "assimilated into" the common goal "in such a way that separation and distinction of each author's contribution becomes impossible."[14]   Federal Law No. 7 of the Year 2002 Concerning Copyright and Neighboring Rights, art. 1.   Absent an agreement to the contrary (and I am unaware of any), the natural or legal person who has directed the creation of the collective work is the author of the work.[15]   Id. art. 26.   MBC is therefore the author of these four programs.

---

[13] Specifically, an episode of Style with Joelle, a fashion show that airs on MBC and was recorded on February 15, 2014; an episode of Tasali, a game show that airs on MBC Kids and was recorded on February 16, 2014; an episode of Chef Hassan, a cooking show that airs on MBC Masr and was recorded on February 17, 2014; and an episode of Moukabala Khassa, a talk show that airs on Al Arabiya and was recorded on February 15, 2014.   (Doc. 73-6, ¶ 11).

[14] This should not be confused with the concept of a "collective work" under United States copyright law, which is a work incorporating elements from multiple authors, each of which "constitut[es a] separate and independent work[] in [it]self."   17 U.S.C. § 101.

[15] Lebanese and Egyptian law contain similar provisions that operate to vest copyright in the person who directed creation of a "collective work."   Law No. 82 of 2002 on the Protection of Intellectual Property Rights, arts. 174-75 (Egypt); Law No. 75 on the Protection of Literary and Artistic Property, art. 7 (Lebanon).

All of the agreements transferring the US public performance and distribution rights to Plaintiff satisfy the Copyright Act's writing and signature requirements,[16] and are otherwise valid and enforceable under both US and UAE law.   The copyrights have not been registered, but registration is not a prerequisite to this infringement suit because the works were first published in the United Arab Emirates.   (Doc. 73-6, ¶ 13); 17 U.S.C. § 101.   Accordingly, Plaintiff has a copyright in the four named MBC programs, as well as any other program in which the foreign language networks owned copyright that was broadcast during the term of Plaintiff's licenses.

Lastly, there is no reason to believe Plaintiff's copyrights in these programs are not valid and enforceable under United States law.   Plaintiff has pled and Defendants are deemed to have admitted that these programs are original works of authorship that have been fixed in a tangible medium of expression.   (Doc. 49, ¶ 32); see 17 U.S.C. § 102(a). Because the works were first published in a state that is a party to the Berne Convention, they are entitled to protection under United States law.[17]   Thus, Plaintiff has established that it owns a valid copyright in these television programs, as well as any other programs

---

[16] All but one of the documents contains a physical, handwritten signature.   The remaining document consists of an email exchange between a representative of Dish Network and a representative of the broadcaster of the ESC and Nile Drama channels, in which the parties agree that Plaintiff will continue to carry the channels pursuant to the original agreement between them.   See emails dated August 28, 2013 between Sruta Vootukuru and Bahieldin HZ Elibrachy (Doc. 84-2, pp. 45-46).   But the fact that the extension of the agreement regarding these channels was completed by email does not render the assignment of the associated copyrights ineffective under § 204.   See Metro Regional Information Systems v. American Home Realty Network, 722 F.3d 591, 602-03 (4th Cir. 2013) (holding that, pursuant to the E-Sign Act, 15 U.S.C. § 7001 et seq., a signature in an email can satisfy the signature requirement in § 204 of the Copyright Act).

[17] Works first published in a foreign country are entitled to protection under the Copyright Act if, when they were first published, both the country of first publication and the United States were parties to the Berne Convention.   17 U.S.C. §§ 104(b), 101.   The Berne Convention entered into force in the United States on March 1, 1989 and in the United Arab Emirates on July 14, 2004.   See World Intellectual Property Organization, Contracting Parties - Berne Convention, http://www.wipo.int/treaties/en/ShowResults.jsp?lang=en&treaty_id=15.   Of the 23 UN member states that have Arabic as an official language, only Eritrea, Iraq, and Somalia have not ratified the Berne Convention. Id.   The disputed states of Palestine and the Sahrawi Arab Democratic Republic (which claims sovereignty over Western Sahara) are also not parties to the Berne Convention.   Id.

broadcast on the licensed channels in which the foreign-language networks own

copyrights.

Plaintiff has also established that Defendants infringed its right of public

performance of these works.   Plaintiff has pled and Defendants are deemed to have

admitted that GTV is "the provider" of the infringing channels, including the MBC channels

and that along with TV Net, GTV "transmitted" the channels "to customers who requested

access to them using their subscription to TV Net's IPTV or WebTV service."   (Doc. 49,

¶ 21).   These transmissions constitute "public performance[s]" within the meaning of

§ 106(4), see American Broadcasting Companies, Inc. v. Aereo, Inc., 134 S. Ct. 2498

(2014) (holding that company that streamed broadcast television programs to subscribers

publicly performed those programs), which were made in the United States, during the

time when Plaintiff's agreements with the foreign-language networks were in force.

(Doc. 49, ¶ 33).   Notably, between February 13 and February 19, 2014, GTV publicly

performed the four works identified in Mr. ElDanaf's declaration.   (Doc. 73-6, ¶ 11).   This

is sufficient to show that GTV infringed Plaintiff's copyrights in these programs.   Because

Halabi "authorized, controlled, participated in, and received direct financial benefits from"

GTV's infringing activity (Doc. 49, ¶ 5), he is also liable for infringement.   See Southern

Bell Telephone & Telegraph Co. v. Associated Telephone Directory Publishers, 756 F.2d

801, 811 (11th Cir. 1985).[18]

C. Damages

A plaintiff who prevails on a claim of copyright infringement "is entitled to the actual

damages suffered ... as a result of the infringement, and any profits of the infringer that

---

[18] Plaintiff does not seek default judgment on the remaining counts of its complaint.   Accordingly, I
recommend the Court dismiss them without prejudice.

are attributable to the infringement and are not taken into account in the computing of actual damages."  17 U.S.C. § 504(b).  "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work."  Id.

Plaintiff seeks an award of $956,649 which represents payments made by Defendant TV Net directly to GTV or to third parties designated by GTV, in exchange for GTV's IPTV and WebTV products and services.  (Doc. 79, p. 4).  The declaration from Defendant Mohammad Mustapha, owner and operator of TV Net, and wire transfer records of the payments support this amount of damages.  (Docs. 79-1, 79-2).

Read literally, all § 504(b) requires is for a plaintiff to show the defendant's revenues.  But, courts uniformly require a plaintiff to present some reasonable relationship between the infringement and revenue to satisfy its initial burden.  See Balsley v. LFP, Inc., 691 F.3d 747, 769 (6th Cir. 2012); William A. Graham Co. v. Haughey, 646 F.3d 138, 141 (3d Cir. 2011); Polar Bear Productions, Inc. v. Timex Corp., 384 F.3d 700, 711 (9th Cir. 2004); Andreas v. Volkswagen of America, Inc., 336 F.3d 789, 796 (8th Cir. 2003); Davis v. Gap, 246 F.3d 152, 160 (2d Cir. 2001); see also Taylor v. Meirick, 712 F.2d 1112, 1122 (7th Cir. 1983) ("If General Motors were to steal your copyright and put it in a sales brochure, you could not just put a copy of General Motors' corporate income tax return in the record and rest your case for an award of infringer's profits.").  The Mustapha declaration is sufficient to show the necessary link between the infringing activity and the $956,649 in payments made by TV Net to GTV or third parties at GTV's behest.

These payments were made pursuant to a distribution agreement between TV Net and GTV wherein TV Net would market GTV's services and sell equipment, IPTV service, and internet TV service to US subscribers in exchange for a share of subscription revenues.   (Doc. 79-1, ¶¶ 3-6).   A consumer who subscribed to GTV and TV Net's services would be able to view the infringing channels.   And, GTV's transmission of these channels constituted a "public performance" under the Copyright Act.   While GTV and TV Net customers could also view other channels to which Plaintiff may not have had an exclusive license, it is Defendants' burden to show the "elements of profit attributable to factors other than" infringement.   17 U.S.C. § 504(b).   GTV and Halabi have not met their burden.   Accordingly, I recommend the Court enter judgment in Plaintiff's favor, against GTV and Halabi, in the amount of $956,649.

D. Injunctive Relief

The Court may grant a copyright holder who prevails in an infringement action an injunction "on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."   17 U.S.C. § 502(a).   "[W]ell-established principles of equity" generally require a plaintiff seeking a permanent injunction to demonstrate

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006).   "The decision to grant or deny a permanent injunction is an act of equitable discretion by the district court." Id.

I am satisfied that Plaintiff has suffered and continues to suffer irreparable injury from GTV and Halabi's infringement of its copyrights.   While Plaintiff may be able to win

a monetary judgment based on future infringement, it should not be required to litigate in

order to enforce its exclusive rights to distribute and publicly perform the works at issue.

17 U.S.C. § 106.   Additionally, it is unclear that Plaintiff would be able to actually recover

money damages from these Defendants.   Given the willfulness of the infringement, the

balance of the equities tips in Plaintiff's favor.   Finally, an injunction here would serve the

public interest.   Failing to enjoin infringement of this sort would diminish the value of

exclusive licenses to distribute foreign television programming in the United States,

thereby making it less likely that those who create such programming will actually license

it to U.S.-based television providers.

 E. Crafting a Proper Injunction

 Rule 65(d)(1) requires that "[e]very order granting an injunction ... (A) state the

reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable

detail–and not by referring to the complaint or other document–the act or acts restrained

or required."   These provisions are not "mere technical requirements," <u>Schmidt v.

Lessard</u>, 414 U.S. 473, 476 (1974), but important safeguards rooted in constitutional due

process concerns.   Because a party who violates an injunction may be subject to

criminal contempt, a party subject to one is entitled to "fair warning" of "what [conduct] is

prohibited."   <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 109 (1972).   Rule 65 is

"designed to prevent uncertainty and confusion" about the scope of injunctions, <u>Schmidt</u>,

414 U.S. at 476, by requiring district courts who write them to "frame [their] orders so that

those who must obey them will know what the court intends to require and what it means

to forbid."   <u>Int'l Longshoreman's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n</u>,

389 U.S. 64, 76 (1967).   The Court has "an independent duty to assure that the

injunctions it issues comply with" Rule 65.   Chicago Board of Education v. Substance, Inc., 354 F.3d 624, 632 (7th Cir. 2003).

An injunction is appropriate because GTV and Halabi have infringed Plaintiff's copyrights by publicly performing television programs in the United States, there is no reason to believe they will not continue to do so unless enjoined, and because Plaintiff has satisfied the traditional four-factor test for injunctive relief.   However, Plaintiff's proposed injunction requires modification to ensure compliance with Rule 65(d).   The first two paragraphs of the proposed injunction would bar Defendants from distributing or publicly performing in the United States by IPTV (in paragraph a) or Internet (in paragraph b) specifically enumerated television channels.   I do not think this is a problem.   While the foreign-language networks–and, therefore Plaintiff–may not have a copyright on every program shown on these channels, the fact that an injunction incidentally protects the rights of non-parties or even forbids some lawful activity does not necessarily make the injunction overbroad.   See, e.g., AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531, 1547-48 (11th Cir. 1986) (holding that district court could enjoin trademark infringement defendant from using any image of a polar bear on a five ounce chocolate-covered ice cream bar, despite the fact that plaintiff "has no exclusive right to use a polar bear image"); Russian Media Group, LLC v. Cable America, Inc., 598 F.3d 302, 306-08 (7th Cir. 2010) (upholding preliminary injunction barring defendant, who "st[ole]" Russian language programming from satellite television providers and provided the content to consumers "at a discount," from transmitting any Russian language television programming).

The third paragraph, which, if entered, would enjoin any distribution or public performance of "any other television channel in any manner that violates the exclusive distribution or public performance rights of DISH" is, in my view, overbroad, and violates

the principle that injunctions "must be narrowly tailored to remedy the specific harm shown." Aviation Consumer Action Project v. Washburn, 535 F.2d 101, 108 (D.C. Cir. 1976); see also e360 Insight v. The Spamhaus Project, 500 F.3d 594, 604 (7th Cir. 2007) (courts must "'tailor injunctive relief to the scope of the violation found'" (quoting Nat'l Org. for Women, Inc. v. Scheidler, 396 F.3d 807, 817 (7th Cir. 2005))).  This language also raises serious notice concerns, as Plaintiff has not explained how Defendants are supposed to know which programs Plaintiff owns exclusive distribution or public performance rights in.  Finally, the language proposed by Plaintiff would make the injunction global in scope.  Such an injunction would exceed both the scope of Plaintiff's copyrights and the territorial reach of the Copyright Act.  See Subfilms, Ltd. v. MGM-Pathe Communications Co., 24 F.3d 1088, 1095-96 (9th Cir. 1994) (noting "undisputed axiom" that United States copyright law has "no application to extraterritorial infringement").

As authority for such a broad injunction, Plaintiff cites cases supporting the proposition that a court may enjoin infringement not only of works currently existing, but of works that will be created in the future.  See, e.g., Arista Records, Inc. v. Beker Enterprises, Inc., 298 F. Supp. 2d 1310, 1315 (S.D. Fla. 2003); Sony Music Entertainment, Inc. v. Global Arts Productions, 45 F. Supp. 2d 1345, 1347 (S.D. Fla. 1997) (citing Pacific & Southern Co. v Duncan, 744 F.2d 1490 (11th Cir. 1984)).  That of course, is different than entering an injunction that is overbroad in geographic scope. And, the injunction I am recommending will enjoin infringement of future works by prohibiting GTV and Halabi from distributing or publicly performing any programming on the enumerated channels.

Plaintiff argues that a narrower injunction will leave it "vulnerable" to future infringement "and call for additional litigation."   This assumes Defendants will continue to unlawfully distribute the programming after the Court enters a judgment declaring such conduct unlawful.   I am unwilling to make this assumption absent evidence that Defendants are likely to violate the Court's judgment.   Furthermore, if Plaintiff obtains exclusive licenses for any additional channels, and Defendant refuses to stop transmitting them to United States customers, Plaintiff can ask the Court to modify the injunction to encompass the new channels.   See System Federation No. 91, Railway Employees' Dept., AFL-CIO v. Wright, 364 U.S. 642, 646–48 (1961).

### III. Recommendation

Upon consideration of the foregoing, I respectfully recommend that:

1. Plaintiff's motions for default judgment (Docs. 73, 79) be **GRANTED**.

2. The Court enter an order permanently enjoining GTV and Halabi, together with their officers, agents, servants, employees, attorneys, or other persons acting in active concert or participation with any of the foregoing persons that receives actual notice of the injunction from:

   a. Distributing or publicly performing in the United States, by Internet or IPTV, content on any of the following channels: Aghapy TV, Al Arabiya, Al Yawm, Dream 2, ESC, Future TV, MBC, MBC Drama, MBC Kids, MBC Masr, and Nile Drama; and

   b. Distributing or publicly performing in the United States, by IPTV, content on any of the following channels: IQRAA, New TV, and Noursat.

3. The Court enter judgment for Plaintiff against GTV and Halabi, jointly and severally, in the amount of $956,649.

Specific written objections to this report and recommendation may be filed in accordance with 28 U.S.C. § 636, and M.D. Fla. R. 6.02, within fourteen (14) days after service of this report and recommendation.   Failure to file timely objections shall bar the party from a de novo determination by a district judge and from attacking factual findings on appeal.

**RESPECTFULLY RECOMMENDED** at Orlando, Florida on October 10, 2014.

THOMAS B. SMITH
United States Magistrate Judge


Copies furnished to:

Presiding United States District Judge
Counsel of Record
Unrepresented Parties